UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 06-4731(DSD/SRN)

Shelia Denise Smith,

      Plaintiff,

v.                                  **ORDER**

Fairview Ridges Hospital,

      Defendant.

    Gerald T. Laurie, Esq., Ian S. Laurie, Esq. and Laurie & Laurie, 1660 South Highway 100, Suite 508E, St. Louis Park, MN 55416, counsel for plaintiff.

    Daniel R. Kelly, Esq. and Felhaber, Larson, Fenlon & Vogt, 220 South Sixth Street, Suite 2200, Minneapolis, MN 55402, counsel for defendant.

This matter is before the court upon defendant's motion for summary judgment. Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court grants defendant's motion.

**BACKGROUND**

From March 2005 until her resignation in June 2006, plaintiff Shelia Smith ("Smith"), an African-American woman, worked primarily as a transport aid in the emergency room at Fairview Ridges Hospital ("Fairview") in Burnsville, Minnesota. During this period, Smith was one of two African-American employees out of the roughly one hundred employees working in the emergency room. As a

transport aid, Smith's primary responsibility was to transport patients from the emergency room to other areas of the hospital. Smith's duties also included "[m]aking beds, stocking, general cleaning, assisting patients, taking vitals" and other delegated tasks. (Smith Dep. at 40.)

In June and July 2005, Patricia Pousard ("Pousard") - Smith's supervisor - discussed concerns with Smith regarding her attitude and behavior. On August 17, 2005, Pousard filed a Notice of Corrective Action to address those concerns. The Corrective Action identified specific concerns with Smith's personal phone calls, frequent cigarette breaks, failure to answer the phone, rudeness on the phone and the timing of her breaks. (Pl. Ex. I.) However, in response to Smith's rebuttal of the charges in the Corrective Action, Pousard and Lori Stack ("Stack") - the emergency room director - deferred enforcement of the Corrective Action plan.

In October 2005 Smith observed co-workers viewing an article about Hurricane Katrina on the website of The Onion, a political satire publication.[1] A photograph in the article depicts a helicopter hovering over flooded houses with a group of African-

---

[1] The record is unclear as to the actual date of the incident. Smith stated in her deposition that the incident occurred in August 2005. However, the article is dated September 7, 2005, and Smith's EEOC charge indicates that the incident took place in October 2005. The court adopts the date in the EEOC charge because the date alleged by Smith is impossible. Also, Smith indicates that the employees were viewing a video. (Smith Dep. at 83.) However, the record contains no evidence of a video.

Americans on the porch of one of the houses. The photograph's caption states, "FEMA representatives call out to survivors, 'Show us your tits for emergency rations!'" (Pl. Ex. E.) Smith believed the article was racist and orally reported her concerns to Pousard. (Id. at 56.)

In November 2005 Pousard issued Smith a formal Notice of Corrective Action in response to three additional incidents occurring in September and October. Among other things, the Corrective Action required that Smith receive permission from the charge nurse, the lead health unit coordinator and an emergency room technician before taking a break. On November 29, 2005, Smith e-mailed a lengthy and detailed response to Sally Haack ("Haack") - Fairview's Human Resources Representative. In this e-mail, Smith noted concern about discrimination in the emergency room and specifically referenced the incident regarding the article on The Onion's website.

In December 2005, Smith observed two co-employees - Tracee Gunnare ("Gunnare") and Mathew Banyai ("Banyai") - viewing the website www.getoffended.com. At that time, Smith observed the following two statements on the website:

"Guns don't kill people, only angry minorities kill people."

- "How do you stop five niggers from raping a white girl? You throw them a basketball."[2]

_____

[2] After the incident, Smith viewed the website from home and
(continued...)

3

(Smith Dep. at 88.) Neither Gunnare nor Banyai said anything to Smith at the time, but Smith indicated that they invited her to look at the website and taunted her through their nonverbal communications. (Id. at 91-92.) On December 11, 2005, Smith sent an e-mail to Fairview's Haack describing the second incident in detail, referencing the first incident and asking that something be done about the behavior. (Pl. Ex. K.) In response, Haack confronted Gunnare and Banyai individually and reminded them that internet usage at work was inappropriate. (Stack Dep. at 13-19.) Fairview took no further actions to address Smith's complaints.

On December 16, 2005, Smith's doctor wrote a letter indicating that due to a medical condition she was limited for up to three months to pushing or pulling seventy pounds and lifting between sixty and seventy pounds. As a result, Smith could not work as a transport aid. Instead, Smith began picking up shifts as a Nursing Assistant to accommodate her medical restrictions. The Nursing Assistant position, however, was a "casual" position that did not guarantee benefits. To avoid losing her benefits, Jenny Austerman - a Payroll and Benefits Specialist - suggested on February 23, 2006, that Smith take a leave of absence based upon Smith's benefit eligible transport aid position. (Def. Ex. A.) Smith, however,

---

[2](...continued)
printed several pages of its content. However, in her deposition, Smith testified to viewing only these two statements at the time Gunnare and Banyai were viewing the website.

did not file the paperwork for the leave of absence and returned to her position as a transport aid after her medical restrictions were lifted in early April.

Before returning to the emergency room, Smith filed a Notice of a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 9, 2006, alleging race discrimination and retaliation arising out of the October and December internet incidents. On July 31, 2006, the EEOC found "reasonable cause to believe that [Fairview] subjected [Smith] to a hostile work environment and retaliated against her in violation of Title VII." (Def. Ex. A.)

Upon Smith's return to the emergency room, she received another verbal advisement and Notice of Corrective Action expressing concern with her unscheduled time off ("UTO") usage. According to the notice, Smith's UTO usage between April 7, 2006, and May 15, 2006, was twenty-three percent. The notice provided that if Smith's UTO usage did not decrease to below five percent within two months she would receive a written advisement.

Early in 2006, Smith applied and was rejected for a Nursing Assistant position at Fairview. Smith was not considered for the position because of her corrective actions. (Pl. Ex. K.) In response, Smith sent an e-mail explaining the circumstances surrounding her corrective actions to Jill Kortenhof on May 18,

2006.[3] (Id.)  Thereafter, on June 7, 2006, Smith sent an e-mail to Stack informing her that she would be resigning from the emergency room on June 25, 2006.  Smith stated that her reason for resigning was "to eliminate the stressfulness of corrective actions(s) [sic] etc."  (Def. Ex. A.)  Smith has not worked at Fairview in any capacity since her resignation.

Smith filed this suit pro se on December 1, 2006.[4]  During her deposition on August 14, 2007, Smith testified to various other incidents of alleged discrimination:

- In April or May 2005, Smith brought chicken to a potluck for Fairview employees.  At some point, Smith overheard one nurse ask another nurse, "who brought the chicken?"  The nurse, allegedly referring to Smith, responded, "who else?" (Smith Dep. at 68-69.)  Smith took offense to the comment and orally reported it to Pousard.

- After Smith had worn her hair braided in May 2005, a picture of the Little Rascals character Buckwheat was posted on an emergency room door along with childhood pictures of other employees.  The caption on the picture stated "guess who this is?"  Smith inferred that the caption referred to her and took offense because "Buckwheat is part of the racial stereotype of blacks."  (Id. at 67.)  Smith complained to Pousard, who allegedly responded "I don't know why they act like that, Shelia.  There are cultural differences, but I don't know why they act like that."  (Id.)  The picture, however, remained on the door.  Pousard

---

[3] On June 3, 2006, Smith also inquired with Paula Welford ("Welford") about a Nursing Assistant position in the "float pool." Welford responded on June 5 that no positions were open at that time. (Pl. Ex. K.)

[4] Smith has been represented by counsel since at least June 22, 2007.

6

testified that she did not take it down because she thought it was a joke and did not consider it inappropriate. (Pousard Dep. at 14.)

- In June or July 2005, a nurse, after a confrontation with Smith, stated that "these black aides don't know what they're doing." (Smith Dep. at 76.) Smith orally reported this incident to Pousard.

- In September or October 2005, Smith brought an African dish for lunch that contained fish. A nurse asked whether someone had fish in their food, and upon learning that Smith's dish contained fish, commented that she had smelled better food in her garbage. Smith reported the incident to a nurse. (Id. at 79-81.)

- In April 2006, after Smith returned to the emergency room, she overheard a conversation between a nurse and Gunnare. Gunnare stated "If she's unhappy here, why does she come back," to which the nurse allegedly responded, "Just like a dog, you beat them and abuse them, they still come back. Just like any good runaway slave would." Smith orally reported the incident to Pousard. (Id. at 96-97.)

- Smith was talking with a volunteer from Somalia about ethnic foods and job opportunities at Fairview. When Smith left, Gunnare confronted the volunteer and told her that her conversation with Smith was inappropriate. (Id. at 99-100.) A health unit coordinator wrote a statement for Smith indicating that she did not find the conversation inappropriate. Smith gave the statement to Haack and Pousard. (Id. at 101.)

- Upon learning that Smith spoke Spanish, a nurse asked if she was Puerto Rican, to which Smith responded "[n]o, I'm black. Look at me, I'm black." (Id.)

- Smith noticed that an emergency room technician had pimples on her forehead and advised her to use a facial cleanser that Smith used for a pimple on her cheek. The technician replied "people can't see yours because you're black," to which Smith responded that the technician did not "have to

7

>    point out the fact that [Smith is] black every time
>    we talk." (Id. at 103.)
>
> •  A nurse referred to Smith as "gal". Smith asked
>    her not to call her "gal" again because "it's
>    personal when it comes to African-Americans or
>    blacks, one or the other." (Id. at 104.)
>    Specifically, Smith indicated that the term implies
>    "a female slave that works in the big house of the
>    master." (Id. at 105.)

In addition to Smith's testimony, Teyana Jackson ("Jackson") - an African-American co-employee at Fairview - testified that she heard a co-employee state in reference to Smith that "she needs to go back to the ghetto where she came from." (Jackson Dep. at 15.) Jackson also testified that she left after a short period of time at Fairview because she was uncomfortable with the emergency room's environment and felt that at times she was treated differently from white employees. (Id. at 32.)

Assuming the truth of the above allegations, Fairview now moves for summary judgment on all of Smith's claims.[5]

---

[5] Smith's Complaint states that she was "retaliated against for filing a discrimination complaint," the she was "subject to a hostile and harassing work environment because [she] filed a discrimination complaint," and that her civil rights were "violated under the Title VII Civil Rights Act of 1964." (Compl. ¶ 3(a), (b), (c).) Smith also states that she was forced to resign from her position in the emergency room because of discrimination, harassment and demeaning treatment. (Id. ¶ 5(g).) The court interprets the Complaint to assert the three claims addressed by the parties in their briefs: (1) hostile work environment (2) retaliation; and (3) constructive discharge.

**DISCUSSION**

**I.   Standard of Review**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of her claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Id.

9

**II.  Hostile Work Environment**

To succeed on a hostile work environment claim, a plaintiff must demonstrate that (1) she belongs to a protected group, (2) she was subject to unwelcome harassment, (3) a causal nexus exists between the harassment and the protected group status, (4) the harassment affected a term, condition, or privilege of her employment and (5) defendants knew or should have known of the harassment and failed to take proper action.  See Tademe v. St. Cloud State Univ., 328 F.3d 982, 991 (8th Cir. 2003).

To determine whether plaintiff has demonstrated that the harassment affected a term, condition or privilege of her employment, the court looks at all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Woodland v. Joseph T. Ryerson & Son, Inc., 302 F.3d 839, 843 (8th Cir. 2002) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-23 (1993)).  A plaintiff "must show both that the offending conduct created an objectively hostile work environment and that she subjectively perceived her working conditions as abusive."  Williams v. City of Kansas City, 223 F.3d 749, 753 (8th Cir. 2000) (citation omitted).  To avoid imposing "a code of workplace civility," the threshold for actionable harm is high.  Woodland, 302 F.3d at 843.  "More than a few isolated

10

incidents are required," and the harassment must be so intimidating, offensive, or hostile that it "poisoned the work environment." Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 967 (8th Cir. 1999) (citations omitted). "These standards are designed to 'filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, [race]-related jokes, and occasional teasing.'" Duncan v. Gen. Motors Corp., 300 F.3d 928, 934 (8th Cir. 2002) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).

Smith's allegations with respect to harassment affecting a term, condition or privilege of her employment fall into three categories. First, several of Smith's allegations are only tenuously related to race and do not evince racial animus. The comment about Smith's African dish related only to the smell of the food, not Smith's race. Further, the comments about pimples and Smith's ability to speak Spanish reflect naivete or a lack of tact on behalf of the speaker, but objectively they were not racially based and did not constitute discriminatory conduct. Moreover, no evidence other than Smith and the Somali volunteer's race suggests that Gunnare confronted them because of their race. Finally, the article from The Onion website shows a photograph of several African-Americans, but the caption - although offensive - is not expressly related to race. In addition, the employees viewing the website made no comments to Smith about the article or about race

11

in general. The allegations in this category provide little or no support for Smith's contention that she experienced frequent or severe discriminatory conduct in the emergency room at Fairview.

Second, several of Smith's allegations may give rise to an inference that they were racially motivated. "The term 'Buckwheat' is a racial slur when it is directed towards a black employee in the context of an employment relationship." Simmons v. Oce-USA, Inc., 174 F.3d 913, 915 (8th Cir. 1999) (citation omitted); see also Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 439 (2d Cir. 1998) (calling plaintiff "Buckwheat" along with numerous other racially derogatory names supported finding hostile work environment); Daniels v. Essex Group, Inc., 937 F.2d 1264, 1274 (7th Cir. 1991) (plaintiff called "Buckwheat" for first ten years of employment). In this case, although the "Buckwheat" picture was not expressly directed at Smith, it can be reasonably inferred that the picture referenced her because the only other African-American employee in the emergency room already had his picture on the board. (Smith Dep. at 67-68.) With respect to the chicken comment, courts have held that statements implying that "all black people love fried chicken" are offensive. See Copeland v. Hussmann Corp., Civ. No. 4:06-839, 2007 U.S. Dist. LEXIS 79631, at *21 (E.D. Mo. Oct. 26, 2007). As above, the chicken comment was not made directly to Smith, but it can reasonably be inferred from the circumstances that it referenced her. Likewise, courts have

determined that comments referring to African-Americans as coming from the "ghetto" may be racially inappropriate. See Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337, 348 (5th Cir. 2007) (calling inner-city children "ghetto children" inappropriate). Finally, in certain circumstances, being called "gal" may support a finding of racial animus and a hostile work environment. Cf. Canady v. Wal-Mart Stores, Inc., 440 F.3d 1031, 1035 (8th Cir. 2006) (use of "boy" may evidence racial animus depending on context); White v. BFI Waste Servs., LLC, 375 F.3d 288, 297 (4th Cir. 2004) (use of "boy" on daily basis with other derogatory names supports hostile work environment). Here, however, Smith refers to an isolated incident in which the nurse who called her "gal" allegedly refers to everyone as gal. (Smith Dep. at 104-05.) In other words, the record does not support an inference that the nurse's comment reflected racial animus. However, on the whole, the permissible inferences in this category generally support Smith's claim.

Third, Smith alleges certain incidents that express overt racial animus. The material Smith observed Gunnare and Banyai viewing on www.getoffended.com was highly offensive and unambiguously racist, and they allegedly taunted Smith with the material through their non-verbal communications. Moreover, a nurse singling out "black aides" as those that don't know what they're doing exhibits racial animus. Likewise, the nurse's

13

alleged statement referring to Smith as a beaten and abused slave that returns "like any good runaway slave" is abhorrent and expresses unambiguous racial animus. The incidents in this category directly support Smith's claim.

In sum, the court is left with six plausible incidents of alleged harassment that occurred during Smith's twelve months of active employment in the emergency room,[6] and Jackson's testimony that she left the department because she was uncomfortable there. The incidents all involved co-workers - not supervisors - making racially derogatory statements or engaging in racially offensive conduct, and none of the statements involved the explicit and threatening racial epithets that place a case on the "cusp of submissibility." See Jackson v. Flint Ink N. Am. Corp., 382 F.3d 869, 970 (8th Cir. 2004). Therefore, examining the totality of the circumstances, the court determines that the alleged harassment was not sufficiently severe or pervasive to affect a term, condition or privilege of Smith's employment. Accordingly, summary judgment is warranted on Smith's hostile work environment claim.

**III. Retaliation**

In the absence of direct evidence of retaliation, the court examines plaintiff's claim under the familiar three-step McDonnell Douglas burden-shifting analysis. See Bainbridge v. Loffredo

---

[6] The court does not include the roughly four month period in which Smith did not work in the emergency room because of her medical restriction.

14

Gardens, Inc., 378 F.3d 756, 760 (8th Cir. 2004). Plaintiff must first establish a prima facie case. See id. If successful, the burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason for its conduct. See id. If defendant offers such a reason, plaintiff must show that the reason is pretextual. See id. To establish a prima facie case of retaliation, "a plaintiff must show (1) that he or she engaged in statutorily protected activity; (2) an adverse employment action; and (3) a causal connection . . . between the two events." Green v. Franklin Nat'l Bank of Minneapolis, 459 F.3d 903, 914 (8th Cir. 2006) (citation and quotation omitted).

Smith engaged in protected activity when she filed the EEOC complaint, and the court assumes that her other reports of harassment are similarly protected. See McClure v. Career Sys. Dev. Corp., 447 F.3d 1133, 1137 (8th Cir. 2006) ("Filing an employment discrimination complaint is a protected activity." (citation omitted)); Peterson v. Scott County, 406 F.3d 515, 524 n.3 (8th Cir. 2005) (complaint about conduct that did not violate Title VII protected if reasonable). Moreover, the court will assume that the corrective actions constitute adverse employment actions. See Kim v. Nash Finch Co. , 123 F.3d 1046, 1060 (8th Cir. 1997) ("[R]etaliatory conduct may consist of action less severe than outright discharge." (citation and quotation omitted)). The court determines, however, that Smith has failed to establish a

causal connection between the protected activity and the corrective actions.

Smith argues that the temporal proximity between her protected activity and receiving the corrective actions establishes causation. "An inference of a causal connection between a charge of discrimination and [an adverse employment action] can be drawn from the timing of the two events, but in general more than a temporal connection is required to present a genuine factual issue on retaliation." Peterson, 406 F.3d at 524 (citations omitted). Moreover, timing alone is insufficient to establish causation where "other evidence overwhelmingly suggests another legitimate reason for the adverse employment action." Jackson v. Flint Ink N. Am. Corp., 370 F.3d 791, 798 (8th Cir. 2004), mod. on reh'g on other grounds, 382 F.3d 869, 870 (8th Cir. 2004).

Smith received a Notice of a Corrective Action in mid-August 2005. By that time, Smith had reported her concerns to Pousard about the chicken incident, the Buckwheat picture and the nurse stating that "black aides don't know what they're doing." The first of these reports took place in April or May 2005 and the last occurred in June or July 2005. The Notice of Corrective Action, however, appears wholly unrelated to those reports. Specifically, the Notice articulates legitimate employment-related reasons for the Corrective Action. Moreover, Pousard and Stack deferred enforcement of the Corrective Action plan until November 2005, and

16

acted only after three additional incidents related to Smith's employment performance. Although Smith also reported the first internet incident during that time, no evidence aside from the tenuous temporal proximity suggests a relationship between the two events.

Smith received another Notice of a Corrective Action in mid-May 2006 because of excessive UTO usage. Again, the only evidence connecting this Corrective Action with protected activity is temporal proximity. Smith filed her Notice of a Charge of Discrimination with the EEOC on March 9, 2006, and returned to work in the emergency room in early April 2006. In April, Smith also reported the "runaway slave" comment to Pousard. The Notice, however, addressed a legitimate employment-related concern - namely, excessive UTO usage between the time Smith returned to the emergency room on April 7, 2006, until May 15, 2006. Because the two corrective actions address legitimate concerns, and both are only tenuously connected temporally to Smith's protected activity, the court determines that Smith has not established a prima facie case of retaliation.[7] Therefore, summary judgment on Smith's

---

[7] In her Complaint, Smith also alleged that Fairview retaliated against her by demanding that she take a leave of absence when her medical restrictions prohibited her from working as a transport aid. The record, however, establishes that Fairview offered her that option so that she could retain her benefits, and there is no evidence that the issue was connected in any way to protected activity. Smith also makes vague and unsubstantiated allegations that she was denied job opportunities in retaliation
(continued...)

retaliation claim is warranted.

**IV. Constructive Discharge**

Fairview argues that Smith's constructive discharge claim fails because she did not raise it in her EEOC Charge of Discrimination. The court, however, does not address Fairview's argument because it determines that Smith's constructive discharge claim fails on the merits.

"'A plaintiff claiming constructive discharge must show that a reasonable person would have found the conditions of employment intolerable and that the employer either intended to force the employee to resign or could have reasonably foreseen that the employee would do so as a result of its actions.'" Fenney v. Dakota, Minn. & E. R.R. Co., 327 F.3d 707, 717 (8th Cir. 2003) (quoting Kerns v. Capital Graphics, Inc., 178 F.3d 1011, 1017 (8th Cir. 1999)). A claim for constructive discharge requires considerably more proof than an "unpleasant and unprofessional environment." Jones v. Fitzgerald, 285 F.3d 705, 716 (8th Cir. 2002). Moreover, "a 'plaintiff must show more than just a Title VII violation by [her] employer in order to prove that [she] has been constructively discharged.'" Reedy v. Quebecor Printing Eagle, Inc., 333 F.3d 906, 910 (8th Cir. 2003) (quoting Coffman v.

---

[7](...continued)
for engaging in protected activity, and that those jobs were given to unqualified white employees. The record, however, does not support such allegations.

Tracker Marine, L.P., 141 F.3d 1241, 1247 (8th Cir. 1998)).

Here, Smith has not established a hostile work environment claim. Moreover, no evidence in the record suggests that Fairview intended to force Smith to resign or that Fairview could reasonably have foreseen that Smith would resign as a result of its actions. Therefore, summary judgment is warranted on Smith's constructive discharge claim.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that defendant Fairview's motion for summary judgment [Doc. No. 16] is granted.

**LET JUDGMENT BE ENTERED ACCORDINGLY**

Dated:  March 18, 2008

                                          s/David S. Doty
                                          David S. Doty, Judge
                                          United States District Court